**[ORAL ARGUMENT NOT YET SCHEDULED]**

**Nos. 21-5243, 22-3037**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

GIORGI RTSKHILADZE,
*Appellant,*
v.
ROBERT S. MUELLER, III, Special Counsel for the Investigation into
Russian Interference in the 2016 Presidential Election, and UNITED STATES
DEPARTMENT OF JUSTICE,
*Appellees.*

In re: GRAND JURY PROCEEDINGS

GIORGI RTSKHILADZE,
*Appellant,*
v.
UNITED STATES OF AMERICA,
*Appellee.*

On Appeal from the United States District Court
for the District of Columbia

**BRIEF FOR APPELLEES**

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MICHAEL S. RAAB
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

In No. 21-5243, plaintiff in district court, and appellant here, is Giorgi Rtskhiladze. Defendants in district court, and appellees here, are Robert S. Mueller, III, Special Counsel for the Investigation into Russian Interference in the 2016 Presidential Election, and the United States Department of Justice.

In No. 22-3037, applicant in district court, and appellant here, is Giorgi Rtskhiladze. In addition, the United States of America was treated as an interested party in district court and as an appellee here.

In neither case did any amici appear in district court, nor has any amici appeared in this Court as of the time of filing.

### B.    Rulings Under Review

In No. 21-5243, the rulings under review are the opinion and order entered on September 1, 2021 (Dkt. Nos. 31 & 32), *see Rtskhiladze v. Mueller*, No. 1:21-cv-1591 (D.D.C), 2021 WL 3912157 (Cooper, J.). In No. 22-3037, the rulings under review are the opinion and order entered on February 16, 2022 (Dkt. No. 20), No. 1:21-gj-48 (D.D.C.), 2022 WL 474134 (Howell, C.J.), and the opinion and order denying reconsideration entered on April 8, 2022

(Dkt. Nos. 25 & 26), No. 1:21-gj-48 (D.D.C.), 2022 WL 1063005 (Howell, C.J.).

## C.    Related Cases

Neither case on review has previously been before this Court or any other, except the district court from which it originated. The undersigned counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28 pending in any court.

*/s/ Sean R. Janda*
Sean R. Janda

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES

GLOSSARY

STATEMENT OF JURISDICTION ............................................................... 1

STATEMENT OF THE ISSUES .................................................................. 2

PERTINENT STATUTES AND REGULATIONS ....................................... 3

STATEMENT OF THE CASE ..................................................................... 3

    A.    Legal Background ........................................................................ 3

    B.    Factual Background .................................................................... 6

    C.    Procedural Background ............................................................. 11

SUMMARY OF ARGUMENT ................................................................... 20

STANDARD OF REVIEW ........................................................................ 23

ARGUMENT ............................................................................................. 24

I.    The District Court Properly Dismissed Rtskhiladze's Complaint ......... 24

    A.    Rtskhiladze Lacks Standing to Pursue His Claims .................... 24

    B.    Rtskhiladze Failed to Plausibly State a Claim for Damages ........ 37

    C.    Rtskhiladze's Equitable Claims Independently Fail for
        Additional Reasons .................................................................. 43

II.    Chief Judge Howell Reasonably Denied Rtskhiladze's Request for
    an Unrestricted Copy of His Grand Jury Testimony ........................... 48

CONCLUSION ......................................................................................... 59

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                      **Page(s)**

*Albright v. United States*,
   732 F.2d 181 (D.C. Cir. 1984) ....................................................... 37, 38, 42

*American Wildlands v. Kempthorne*,
   530 F.3d 991 (D.C. Cir. 2008) ................................................................. 43

*Bennett v. Spear*,
   520 U.S. 154 (1997)................................................................................. 44

*Center for Biological Diversity v. U.S. Dep't of Interior*,
   563 F.3d 466 (D.C. Cir. 2009) ................................................................. 25

*Doe v. Chao*,
   540 U.S. 614 (2004)................................................................................... 3

*Doe v. Stephens*,
   851 F.2d 1457 (D.C. Cir. 1988)................................................................ 48

*Ezzell Trucking, Inc. v. FMCSA*,
   309 F.3d 24 (D.C. Cir. 2002) ................................................................... 26

*Figueroa v. District of Columbia Metro. Police Dep't*,
   633 F.3d 1129 (D.C. Cir. 2011)................................................................ 41

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)............................................................................ 32-33

*Grand Jury, In re*,
   490 F.3d 978 (D.C. Cir. 2007) ..................................................... 50, 51, 57

*Guerrero v. Clinton*,
   157 F.3d 1190 (9th Cir. 1998) ................................................................ 45

*Henke v. U.S. Dep't of Commerce*,
   83 F.3d 1453 (D.C. Cir. 1996) ................................................... 46

*Joshi v. National Transp. Safety Bd.*,
   791 F.3d 8 (D.C. Cir. 2015) ................................................. 22, 45

*Laningham v. U.S. Navy*,
   813 F.2d 1236 (D.C. Cir. 1987) ................................................. 15

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................... 20, 25

*Maydak v. United States*,
   630 F.3d 166 (D.C. Cir. 2010) ......................................... 22, 38, 42

*McKeever v. Barr*,
   920 F.3d 842 (D.C. Cir. 2019) ....................................... 23, 50, 58

*McMorris v. Carlos Lopez & Assocs., LLC*,
   995 F.3d 295 (2d Cir. 2021) ..................................................... 35

*NB ex rel. Peacock v. District of Columbia*,
   682 F.3d 77 (D.C. Cir. 2012) ................................................... 32

*NetworkIP, LLC v. FCC*,
   548 F.3d 116 (D.C. Cir. 2008) ................................................. 33

*Paige v. DEA*,
   665 F.3d 1355 (D.C. Cir. 2012) ............................................... 47

*Pittsburgh Plate Glass Co. v. United States*,
   360 U.S. 395 (1959) ............................................................. 50

*Rehberg v. Paulk*,
   566 U.S. 356 (2012) ............................................................. 52

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*,
   489 F.3d 1267 (D.C. Cir. 2007) ............................................... 34

*Schneider v. Kissinger*,
   412 F.3d 190 (D.C. Cir. 2005) ................................................... 34

*Sealed Case, In re*,
   801 F.2d 1379 (D.C. Cir. 1986) ................................................ 24

*Sealed Case, In re*,
   250 F.3d 764 (D.C. Cir. 2001) .................................................. 50

*Sealed Motion, In re*,
   880 F.2d 1367 (D.C. Cir. 1989) ...........................................55, 56

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................................. 25

*Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*,
   980 F.3d 109 (D.C. Cir. 2020) ................................................. 23

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) ............................................... 42

*Town of Chester v. Laroe Estates, Inc.*,
   581 U.S. 433 (2017) ................................................................. 32

*United States v. John Doe, Inc. I*,
   481 U.S. 102 (1987) ................................................................. 51

*United States v. Sells Eng'g, Inc.*,
   463 U.S. 418 (1983) ................................................. 5, 48, 49-50

*Valero Energy Corp. v. EPA*,
   927 F.3d 532 (D.C. Cir. 2019) ................................................. 44

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ................................................................. 37

**U.S. Constitution:**

Amend. V ...................................................................................... 1

**Statutes:**

Administrative Procedure Act,
  5 U.S.C. § 701 *et seq.* ............................................................................... 1
    5 U.S.C. § 704 ............................................................................. 22, 44

Declaratory Judgment Act,
  28 U.S.C. §§ 2201-2202 ........................................................................ 1

Privacy Act of 1974,
  Pub. L. No. 93-579, § 2(b)(4), 88 Stat. 1896, 1896 ...................................... 4
  5 U.S.C. § 552a ..................................................................................... 1, 3
  5 U.S.C. § 552a(a)(4) ................................................................................. 3
  5 U.S.C. § 552a(a)(5) ............................................................................ 3, 46
  5 U.S.C. § 552a(d)(2)(B)(i) ....................................................................... 4
  5 U.S.C. § 552a(d)(3) ......................................................................... 12, 46
  5 U.S.C. § 552a(e)(5) ................................................................................ 4
  5 U.S.C. § 552a(e)(6) ................................................................................ 4
  5 U.S.C. § 552a(g)(1)(A) ..................................................................... 4, 46
  5 U.S.C. § 552a(g)(1)(C)-(D) ............................................................... 5, 48
  5 U.S.C. § 552a(g)(2) ................................................................................ 4
  5 U.S.C. § 552a(g)(2)-(4) ......................................................................... 48
  5 U.S.C. § 552a(g)(2)(A)-(B) ................................................................... 48
  5 U.S.C. § 552a(g)(4) ..............................................................5, 15, 21, 37, 41

28 U.S.C. § 1291 ....................................................................................... 1

28 U.S.C. § 1331 ....................................................................................... 1

28 U.S.C. § 2680(h) ................................................................................. 41

**Regulation:**

28 C.F.R. § 600.8(c) ................................................................................. 6

**Rules:**

Fed. R. Civ. P. 60(b) .............................................................................. 17

Fed. R. Crim. P. 6(e) ......................................................................... 1, 23, 48

Fed. R. Crim. P. 6(e)(1) .................................................................. 49

Fed. R. Crim. P. 6(e)(2)(B) ....................................................... 5, 49

Fed. R. Crim. P. 6(e)(3)(A) ............................................................ 5

Fed. R. Crim. P. 6(e)(3)(C) ............................................................ 5

Fed. R. Crim. P. 6(e)(3)(E) ....................................................... 6, 49

Fed. R. Crim. P. 6(e)(3)(E)(i) ................................................... 6, 49

**Other Authorities:**

Adam Davidson, *Trump's Business of Corruption*, The New Yorker
   (Aug. 14, 2017) ........................................................................ 29

Office of the Deputy Attorney General, Dep't of Justice, Order No. 3915-2017,
   Appointment of Special Counsel to Investigate Russian Interference with the
   2016 Presidential Election and Related Matters (May 17, 2017),
   https://perma.cc/KX5Z-FN7H ................................................. 6

Special Counsel Robert S. Mueller, III, *Report on the Investigation into Russian
   Interference in the 2016 Presidential Election* (Mar. 2019),
   https://perma.cc/LBG3-8CHQ ..................................... 6-7, 8, 9, 30, 40, 58

U.S. Senate Select Committee on Intelligence, *Senate Intel Releases Volume 5
   of Bipartisan Russian Report* (Aug. 18, 2020),
   https://perma.cc/PT65-D9UU ............................................... 32

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Department | United States Department of Justice |

## STATEMENT OF JURISDICTION

Rtskhiladze brought the claims in his original civil action under the Fifth Amendment, U.S. Const. amend. V, the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Privacy Act, 5 U.S.C. § 552a. The district court had jurisdiction under 28 U.S.C. § 1331. The district court dismissed Rtskhiladze's First Amended Complaint on September 1, 2021. Dkt. No. 31. Rtskhiladze filed a timely notice of appeal on October 28, 2021. Dkt. No. 34.

In the second case on appeal, Rtskhiladze requested that the district court disclose grand jury materials pursuant to its authority under Federal Rule of Criminal Procedure 6(e). The district court had jurisdiction over that request under 28 U.S.C. § 1331. The district court entered an order denying Rtskhiladze's request to release a complete transcript of his grand jury testimony on February 16, 2022. Dkt. No. 20. Rtskhiladze timely moved for reconsideration the next day, Dkt. No. 21, and that motion was denied on April 8, 2022, Dkt. No. 25. Rtskhiladze filed a timely notice of appeal identifying the order and opinion denying reconsideration on June 6, 2022. Dkt. No. 27.

This Court has jurisdiction over both appeals under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

This case concerns a footnote in Special Counsel Robert S. Mueller, III's *Report on the Investigation into Russian Interference in the 2016 Presidential Election.* Footnote 112 in Volume II of the Report discussed text messages exchanged between Michael Cohen and Giorgi Rtskhiladze in October 2016 related to rumors circulating in Russia of allegedly embarrassing tapes of former President Trump. Rtskhiladze believes that discussion contains inaccuracies that have injured him, and he has brought this lawsuit primarily under the APA and the Privacy Act to seek damages and equitable relief for those alleged injuries. The district court dismissed Rtskhiladze's equitable claims for lack of standing and his damages claim for failure to state a claim.

Following that dismissal, Rtskhiladze requested that then-Chief Judge Howell direct the government to provide him with an unrestricted copy of the transcript of his grand jury testimony for use in the civil action. Chief Judge Howell denied that request, although she directed the government to provide Rtskhiladze with access to the transcript and she authorized the government to file the complete transcript under seal in the civil action.

The issues presented are:

1. Did Rtskhiladze establish standing to pursue his APA and Privacy Act claims?

2

2. Did Rtskhiladze state a claim under either the APA or the Privacy Act?

3. Did Chief Judge Howell reasonably deny Rtskhiladze's request to access a copy of his grand jury transcript?

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Legal Background

1. Congress enacted the Privacy Act, 5 U.S.C. § 552a, to "protect the privacy of individuals identified in information systems maintained by Federal agencies." *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quotation omitted). To that end, the Privacy Act regulates (as relevant here) federal agencies' maintenance and use of "records" containing personally identifying information when those records are maintained as part of a "system of records." 5 U.S.C. § 552a(a)(4), (5). The statute defines a "system of records" as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* § 552a(a)(5).

One of the purposes of the Privacy Act is to ensure that the information contained in an agency's system of records is "current and accurate for its intended use." Privacy Act of 1974, Pub. L. No. 93-579, § 2(b)(4), 88 Stat. 1896, 1896. To that end, the Privacy Act requires agencies to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5). The statute also generally requires agencies to "make reasonable efforts to assure that" records are "accurate" and "complete" before disseminating them outside the federal government. *Id.* § 552a(e)(6).

Any individual who believes that an agency's system of records includes information about him that "is not accurate, relevant, timely, or complete" may request that the agency correct the allegedly inaccurate information. 5 U.S.C. § 552a(d)(2)(B)(i). If an agency refuses such a request, the Privacy Act permits the individual to bring a civil action in federal court and to seek an order directing the agency "to amend the individual's record in accordance with his request or in such other way as the court may direct." *Id.* § 552a(g)(1)(A), (2).

In addition, if an agency "fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is

4

necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual"—or if an agency "fails to comply with any other provision" of the Privacy Act "in such a way as to have an adverse effect on an individual"—the aggrieved individual may bring a damages suit in federal court. 5 U.S.C. § 552a(g)(1)(C)-(D), (4). In such a suit, if the "agency acted in a manner which was intentional or willful," the United States is liable for "actual damages sustained by the individual." *Id.* § 552a(g)(4).

2. Rule 6 of the Federal Rules of Criminal Procedure governs the conduct of grand jury proceedings. As particularly relevant here, Rule 6(e) "codifies the traditional rule of grand jury secrecy." *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 425 (1983). Under that provision, all non-witness participants are generally prohibited from disclosing any "matter occurring before the grand jury," "[u]nless these rules provide otherwise." Rule 6(e)(2)(B).

The Rule enumerates the specific circumstances in which disclosure of grand jury materials is permissible. Some of those exceptions apply without need for a court order; for example, the Rule provides for disclosures to other federal attorneys or other federal grand juries, *see* Rule 6(e)(3)(A), (C). In

addition, the Rule provides that district courts have discretion to order
disclosure of grand jury matters in five enumerated circumstances. Rule
6(e)(3)(E). As relevant here, one of those exceptions permits district courts to
order disclosures "preliminarily to or in connection with a judicial
proceeding." Rule 6(e)(3)(E)(i).

### B.    Factual Background

1. In 2017, Robert S. Mueller, III, was appointed as Special Counsel to
investigate, among other things, "any links and/or coordination between the
Russian government and individuals associated with the campaign of President
Donald Trump." Office of the Deputy Attorney General, Dep't of Justice,
Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian
Interference with the 2016 Presidential Election and Related Matters (May 17,
2017), https://perma.cc/KX5Z-FN7H.

Federal regulations require that, upon concluding his work, a Special
Counsel "provide the Attorney General with a confidential report explaining
the prosecution or declination decisions reached by the Special Counsel." 28
C.F.R. § 600.8(c). Pursuant to that provision, Special Counsel Mueller
submitted his report to the Attorney General in March 2019. *See* JA __[Dkt.19-
1.at.13] ¶ 28. The Attorney General then publicly released a redacted version
of the report. *See* Special Counsel Robert S. Mueller, III, *Report on the*

*Investigation into Russian Interference in the 2016 Presidential Election* (Mar. 2019),

https://perma.cc/LBG3-8CHQ (Mueller Report).

2. As alleged in his complaint, appellant Giorgi Rtskhiladze is a

businessman who was born in then-Soviet Georgia and emigrated to the

United States in 1991. *See* JA __[Dkt.19-1.at.8] ¶ 6. Since then, he has engaged

in various business ventures related to connecting American companies with

Georgia and other parts of the former Soviet Union. *See* JA __[Dkt.19-1.at.8-

11] ¶¶ 10-20. In particular, starting in 2010, Rtskhiladze worked with the

Trump Organization—and, in particular, with Michael Cohen, who worked as

Donald Trump's attorney—on contemplated "Trump Tower licensing

projects" in Georgia, Kazakhstan, and Moscow. JA __[Dkt.19-1.at.10-11]

¶¶ 18-20.

In late October 2016, shortly before the 2016 Presidential election,

Rtskhiladze was told by a friend that the friend "had recently attended a dinner

party in Moscow at which he overheard a person at the next table—whom he

did not know—bragging about some tapes related to a trip by Mr. Trump to

Moscow." JA __[Dkt.19-1.at.11] ¶ 21. Rtskhiladze then had the following text

message exchange with Michael Cohen:

> Rtskhiladze: Stopped flow of some tapes from Russia but not sure
> if there's anything else. Just so you know . . .
>
> Cohen: Tapes of what?

Rtskhiladze: Not sure of the content but person is Moscow was bragging had tapes from Russia trip. Will try to dial you tomorrow but wanted to be aware. I'm sure it's not a big deal but there are lots of stupid people.

Cohen: You have no idea

Rtskhiladze: I do trust me.

JA __[Dkt.19-1.at.15] ¶ 31 (ellipses in original).

3. In 2018, Rtskhiladze's connections with the Trump Organization and with Cohen came to the attention of the Special Counsel, and Rtskhiladze was twice interviewed as part of that investigation. JA __[Dkt.19-1.at.12-13] ¶¶ 25-27. In addition, Rtskhiladze alleges that he produced to the Special Counsel approximately 25,000 pages of documents and that he testified before a grand jury. *Id.*

In the publicly released version of the Mueller Report, Rtskhiladze is primarily mentioned in two places. First, in a discussion relating to the Trump Organization's contemplated project in Moscow, the Report canvasses a handful of proposals by Rtskhiladze to connect the Trump Organization with various influential Russian figures. *See* Mueller Report, Vol. I, at 69-70. There, Rtskhiladze is described as a "U.S.-based executive of [a] Georgian company." *Id.* at 70 n.313. Rtskhiladze has not claimed that this portion of the Report is inaccurate or misleading.

8

Second, and more directly relevant to the claims here, Rtskhiladze is mentioned in Footnote 112 of Volume II of the Report, which generally relates to allegations that there were Russian-held compromising tapes of President Trump. That footnote states, in its entirety:

> Comey 1/7/17 Memorandum, at 1-2; Comey 11/15/17 302, at 3. Comey's briefing included the Steele reporting's unverified allegation that the Russians had compromising tapes of the President involving conduct when he was a private citizen during a 2013 trip to Moscow for the Miss Universe Pageant. During the 2016 presidential campaign, a similar claim may have reached candidate Trump. On October 30, 2016, Michael Cohen received a text from Russian businessman Giorgi Rtskhiladze that said, "Stopped flow of tapes from Russia but not sure if there's anything else. Just so you know . . . ." 10/30/16 Text Message, Rtskhiladze to Cohen. Rtskhiladze said "tapes" referred to compromising tapes of Trump rumored to be held by persons associated with the Russian real estate conglomerate Crocus Group, which had helped host the 2013 Miss Universe Pageant in Russia. Rtskhiladze 4/4/18 302, at 12. Cohen said he spoke to Trump about the issue after receiving the texts from Rtskhiladze. Cohen 9/12/18 302, at 13. Rtskhiladze said he was told the tapes were fake, but he did not communicate that to Cohen. Rtskhiladze 5/10/18 302, at 7.

Mueller Report, Vol. II, at 27-28 n.112.

According to Rtskhiladze, Footnote 112 contains two specific inaccuracies. First, Rtskhiladze alleges that "Footnote 112 falsely states that plaintiff is a 'Russian businessman,'" even though Rtskhiladze is "a citizen of the United States"; has "resided in the United States since 1991"; and "is a native of Georgia," which "has been an independent country" since "the collapse of the Soviet Union in 1991." JA __[Dkt.19-1.at.14] ¶ 30.

9

Second, Rtskhiladze alleges that "Footnote 112 misquotes the exchange of" text messages: the footnote quotes the relevant text message as "Stopped flow of tapes from Russia but not sure if there's anything else. Just so you know . . . ." but the text message read, "Stopped flow of *some* tapes from Russia but not sure if there is anything else. Just so u know." JA __[Dkt.19-1.at.15] ¶ 33 (ellipsis and emphasis in original). According to Rtskhiladze, the "omission of 'some' in the quoted text is significant," because "'Stopped the flow of tapes' suggests familiarity with their content while 'stopped flow of *some* tapes' indicates a lack of familiarity with their content." *Id.* (emphasis in original). And Rtskhiladze further suggests that the text message should have been quoted in the context of the additional messages in the exchange to similarly avoid an implication that he knew of the alleged tapes' content. *See* JA __[Dkt.19-1.at.16-18] ¶¶ 34-42.

4. Following the release of the Mueller Report, Rtskhiladze alleges that the media "proceeded to broadcast false, reckless, and defamatory statements about him" based on Footnote 112 and that the footnote and "subsequent feeding frenzy in the media delivered a catastrophic blow to plaintiff's well-earned reputation as an honest Georgia-American businessman." JA __[Dkt.19-1.at.18] ¶ 43. Specifically, Rtskhiladze alleges that "Footnote 112 destroyed plaintiff's ability to continue as a *de facto* ambassador for U.S.-

10

Georgia relations" by "destroy[ing] plaintiff's personal and business reputation" and that following the release of the Mueller Report, "the Georgian Government abandon[ed] the process that already was underway to bestow on plaintiff the status of 'Honorary Consul.'" JA __[Dkt.19-1.at.21] ¶¶ 51-52. In addition, Rtskhiladze alleges that the "stigma" of Footnote 112 has negatively "affected his ability to participate in commercial transactions," and he identifies certain proposed or contemplated business opportunities that he alleges he has been forced to forgo following the release of the Mueller Report. JA __[Dkt.19-1.at.24-25] ¶¶ 60-61.

### C.    Procedural Background

1. After the release of the Mueller Report, Rtskhiladze filed a request under the Privacy Act with the Department of Justice asking that Footnote 112 be amended to remove all references to Rtskhiladze. JA __[Dkt.19-1.at.26] ¶ 64; *see also* JA __[Dkt.20-1.at.7-10]. The request was denied by the Department, which explained that the Mueller Report is "not contained within a [Privacy Act] 'system of records'" and thus cannot be amended pursuant to that statute. JA __[Dkt.20-1.at.11-12]; *see also* JA __[Dkt.19-1.at.26] ¶ 65. Rtskhiladze filed an administrative appeal of that decision, and the decision was affirmed. JA __[Dkt.19-1.at.26-27] ¶ 66-68; *see also* JA __[Dkt.20-1.at.2-6].

2. While his Privacy Act request was pending, Rtskhiladze filed this lawsuit, naming as defendants the Department of Justice and Robert S. Mueller, III. After the appeal of the denial of his request had been pending for more than 30 business days, Rtskhiladze filed his now-operative amended complaint. *See* JA __[Dkt.19-1.at.26-27] ¶¶ 66-67; *see also* 5 U.S.C. § 552a(d)(3) (generally requiring that administrative appeals be resolved within 30 business days). This operative complaint contains four counts.

First, Rtskhiladze brings a claim for damages for deprivation of his "right to procedural due process guaranteed in the Fifth Amendment," for which he seeks "compensatory and exemplary damages in a total amount of $100,000,000." JA __[Dkt.19-1.at.27-29].

Second and third, Rtskhiladze brings claims for equitable relief under the APA (Count II) and the Privacy Act (Count III). For both counts, Rtskhiladze alleges that Footnote 112 contains defamatory or inaccurate statements about him, and he seeks a declaration to that effect and an injunction directing the deletion of all references to him from the footnote. JA __[Dkt.19-1.at.28-29].

Fourth, Rtskhiladze brings a claim for damages under the Privacy Act. In this claim, he alleges that the Department's "failure to comply with the requirements of" the Privacy Act "in drafting Footnote 112" was intentional or willful, and that as a result of Footnote 112's allegedly inaccurate statements,

12

"numerous adverse determinations have been made regarding plaintiff." JA __[Dkt.19-1.at.28-29]. For this count, Rtskhiladze seeks actual damages in an unspecified amount. *Id.*

3. The Department and the Special Counsel moved to dismiss Rtskhiladze's amended complaint, and the district court granted both motions. *See* JA __[Dkt.No.32.at.1-32].

First, the district court dismissed each of Rtskhiladze's claims for equitable relief, concluding that he had not established Article III standing to pursue those claims because he could not demonstrate an ongoing injury either traceable to Footnote 112 or redressable by a favorable decision.

As an initial matter, the district court suggested that Rtskhiladze had failed to plausibly allege that the specific inaccuracies in Footnote 112—the identification of him as "Russian" and the omission of the word "some" in the quoted text message—have caused him any injury in fact. JA __[Dkt.32.at.18-19]. The court then concluded, however, that he had plausibly alleged "harms to his business and reputation" from "the overall impression that the footnote conveys—namely, that Rtskhiladze was generally aware of salacious tapes involving Trump, that he was connected with the alleged purveyors of those tapes, and that he hid his knowledge of the veracity of the tapes from Cohen." JA __[Dkt.32.at.19-20]. On that basis, the court concluded that Rtskhiladze

13

"has standing to seek to damages to redress those injuries." JA __[Dkt.32.at.21].

As the court explained, however, such "past injuries alone are insufficient to establish standing" to seek "forward-looking injunctive and declaratory relief." JA __[Dkt.32.at.21] (quotation omitted). Instead, to demonstrate standing for such relief, a plaintiff "must show that" he is suffering "ongoing injuries [that] are fairly traceable to, and would be redressed by correcting," the challenged action. JA __[Dkt.32.at.22].

And here, the district court concluded, Rtskhiladze is unable to establish either traceability or redressability with respect to any ongoing injury, because in 2020, the Senate Select Committee on Intelligence released its own Report on Russian Active Measures Campaigns and Interference in the 2016 Election[1] that "equally implicates Rtskhiladze in the imbroglio surrounding the Russian government's rumored possession of compromising tapes of Trump" and, indeed, that "quotes the exact same text messages between Cohen and Rtskhiladze that the Mueller Report does." JA __[Dkt.32.at.22-25]. Indeed, as the district court explained, the Senate Report "goes much further than Footnote 112 in describing Rtskhiladze's relationships with Kremlin insiders"

---

[1] This report is available at https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf.

14

and "offers more detail regarding Rtskhiladze's activities" than does "the relatively weak tea of Footnote 112." JA __[Dkt.32.at.25]. Given this "independent, sufficient, unchallenged, and admittedly accurate source" of the same alleged reputational and business injuries "that would not be affected by any decision or relief ordered in this matter," the district court concluded that Rtskhiladze has "failed to carry his burden to show both causation and redressability for his claims seeking prospective equitable relief" and so dismissed those claims. JA __, __[Dkt.32.at.23,27].

Second, the district court concluded that Rtskhiladze had failed to state a claim for damages under the Privacy Act. The court explained that such a claim requires a plaintiff to prove "'that the agency acted in a manner which was intentional or willful,'" which means that the "agency's conduct 'must be so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful.'" JA __[Dkt.32.at.28] (first quoting 5 U.S.C. § 552a(g)(4); then quoting *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987)).

And here, the district court explained, in light of Rtskhiladze's admission of the accuracy of the Senate Report, he cannot plausibly plead "that anyone involved with Footnote 112 acted with the requisite state of mind." JA __[Dkt.32.at.28]. Given the "miniscule differences in content" between

15

Footnote 112 and the Senate Report, the court concluded that Footnote 112's alleged false "implications regarding Rtskhiladze's conduct surrounding the tapes" do not reflect "any intentional or willful disregard of his rights." JA __[Dkt.32.at.29]. And the court further concluded that the specific "clear factual errors uniquely present in the text of Footnote 112" both "are similarly not plausibly chalked up to intentional malfeasance," rather than "a mere drafting error," and also "would not plausibly result in the claimed harm." *Id.*

Third, the district court dismissed Rtskhiladze's claim for damages under the Fifth Amendment. The court explained that this claim was asserted in the complaint against Mueller alone, that Rtskhiladze's briefing failed to "oppose the arguments for dismissal" of this claim, and that the briefing instead sought to improperly recast the claim as being against the Department to "duck and weave around the defendants' briefing." JA __[Dkt.32.at.30-32]. Because Rtskhiladze had forfeited any objection to the dismissal of the count as pled— and because a complaint cannot be amended through briefing—the court dismissed this count. *Id.*

4. Shortly after the district court dismissed Rtskhiladze's complaint, he filed an application with Chief Judge Howell in which he averred that he had testified "before the grand jury investigating Russian interference in the 2016 presidential election" and requested "access to the transcript of his grand jury

16

testimony." JA __[Dkt.2.at.1]. He explained that the request was being made in connection with a contemplated appeal in his just-dismissed civil suit; that he believed the testimony would bolster his case that the alleged inaccuracies in Footnote 112 were intentional and willful; and that, after reviewing the transcript, he intended "to submit an affidavit under seal in his district court suit and ask that it be made part of the record on appeal." JA __[Dkt.2.at.1-3].

Chief Judge Howell granted that request in relevant part and directed the government to arrange for an opportunity for Rtskhiladze and his counsel to review the transcript of his testimony. *See* Minute Order, Dec. 9, 2021. But she also made clear that "this Order does not by itself authorize further disclosure (e.g., for inclusion in filings to be made in the related civil matter) of the contents of the transcripts." *See id.* In a follow-up order, she granted Rtskhiladze's request to be permitted to take notes on the transcript during his review, although the court again made clear that Rtskhiladze and his counsel "shall refrain from disclosing such notes other than to counsel working on the related civil matter" and "shall destroy, upon the completion and filing of the contemplated affidavit," those notes. JA __[Dkt.11.at.5].

Rtskhiladze reviewed his grand jury testimony and then publicly filed, in his underlying civil suit, a motion for relief from the judgment under Federal Rule of Civil Procedure 60(b) that included, in the motion and exhibits,

17

purported grand jury material. *See* JA __[Dkt.20.at.3]. After the district court in that case promptly sealed the motion and exhibits at the government's request, Rtskhiladze requested that Chief Judge Howell clarify that her orders authorized the public disclosure of information from his review. *See* JA __[Dkt.20.at.3-4]. Chief Judge Howell instead clarified that "nothing in the Court's previous orders explicitly or implicitly granted permission to petitioner to disclose publicly material obtained from petitioner's review of his grand jury transcript"; that, indeed, Rtskhiladze had "suggested"—at least five times in his filings—"that he did not intend" to publicly disclose that material; and that her orders expressly stated that they were not authorizing further disclosure of the contents of the transcripts. *See* Minute Order (Jan. 21, 2022).

Following that order, Rtskhiladze moved, in front of Chief Judge Howell, for an order requiring the government to provide him a copy of the transcript of his grand jury testimony and (at least implicitly) for permission to disclose that transcript publicly in connection with his motion for reconsideration in the civil case. *See* JA __[Dkt.20.at.1]. Chief Judge Howell denied that motion. She explained that Rtskhiladze had failed to provide any "clear argument—under a 'particularized need' threshold, a balancing of interests test, or any other standard—as to why he should receive an unrestricted copy of the grand jury transcript." *See* JA __[Dkt.20.at.5-10]. And

she explained that, on the other side of the balance, the government's articulation of an ongoing interest in "criminal and national security matters that arose from the Special Counsel's investigation" and Rtskhiladze's previous failures to comply with the court's restrictions on access weighed against granting his request. *Id.*

Rtskhiladze moved for reconsideration of that decision, and Chief Judge Howell denied the motion. She explained that nothing in Rtskhiladze's motion for reconsideration "upset[]" her previous conclusion that he had failed to articulate any need for a copy of the transcript and that the government continued to make "some showing of interests militating against release of a transcript copy"—a showing that was "now augmented" by additional information "making apparent that petitioner's mishandling of grand jury material, in contravention of Court orders, has already caused improper media publication related to such material." JA __[Dkt.26.at.22-23].

5. Following the original dismissal of his amended complaint in the civil suit, Rtskhiladze filed a timely notice of appeal. JA __[Dkt.34.at.1]. More than four months after the dismissal, Rtskhiladze filed his Rule 60(b) motion for relief from the judgment. That motion was eventually denied, *see* Dkt. No. 49, and Rtskhiladze has not appealed the denial.

19

In addition, after Chief Judge Howell denied his motion for reconsideration of her order denying his request for a copy of his grand jury transcript, Rtskhiladze filed a notice of appeal from that decision. *See* JA __[Dkt.27.at.1].

The two appeals have since been consolidated. *See* Order (Sept. 16, 2022).

## SUMMARY OF ARGUMENT

I.A. Rtskhiladze lacks standing to pursue his civil claims because he has failed to demonstrate any redressable injury caused either by the two specific alleged inaccuracies in Footnote 112—the reference to him as "Russian" and the omission of the word "some"—or by the alleged inaccurate overall impression of him as connected to alleged salacious tapes. That failure is particularly significant in this context, where his alleged injury "depends on the unfettered choices made by independent actors" and thus "much more is needed" from his pleading. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (quotation omitted).

As an initial matter, the district court correctly concluded, *see* JA __[Dkt.32.at.18-19], that Rtskhiladze cannot credibly suggest any injury to his business relationships from either of the specific alleged inaccuracies. Similarly, Rtskhiladze fails to adduce any evidence showing that the overall

20

impression of the footnote led to the loss of any business opportunities or other harms. To the contrary, Rtskhiladze's complaint reveals a number of other sources that, taken together, provide substantially more detail regarding Rtskhiladze's connections with Russia than do the challenged portions of Footnote 112. He has failed to show that the challenged conduct, rather than these sources, caused him any injury.

Even if he had shown some past injury from Footnote 112, the district court correctly held that he lacked standing to pursue any equitable relief because he has not demonstrated any ongoing traceable or redressable injury. In August 2020, the Senate Select Committee on Intelligence released a report that Rtskhiladze admits is accurate and that explores the connection among Rtskhiladze, Cohen, and the alleged tapes in substantially more detail than does Footnote 112. Given the existence of a different (and concededly accurate) government report that contains substantially more detail on this allegedly injurious topic, Rtskhiladze cannot show that he continues to suffer any injury from Footnote 112. JA __[Dkt.32.at.27].

B. Rtskhiladze failed to plausibly state a claim for damages. To state such a claim, he must show that the Special Counsel Office's failure to comply with the Privacy Act was "intentional or willful." 5 U.S.C. § 552a(g)(4). This requires that a "violation of the statute must be so patently egregious and

unlawful that anyone undertaking the conduct should have known it unlawful." *Maydak v. United States*, 630 F.3d 166, 179 (D.C. Cir. 2010) (quotation omitted).

As the district court correctly concluded, Rtskhiladze's allegations fall short of meeting this demanding standard. The drafting of the Mueller Report was an enormous and complicated undertaking that resulted in a nearly 450-page document. The only factual errors alleged by Rtskhiladze were minor errors that are, in this context, "much more obvious[ly]" explained as "a mere drafting error" than as the product of some "intentional malfeasance." JA __[Dkt.32.at.29]. And Rtskhiladze's admission that the Senate Report is accurate "dooms any plausible inference of intentional disregard of his rights" with respect to the alleged overall misimpression generated by Footnote 112, given the substantial similarity between the two. JA __[Dkt.32.at.28].

C. Even if Rtskhiladze had standing, his equitable claims each fail for independent reasons. His APA claim fails because the Mueller Report is not "final agency action," 5 U.S.C. § 704, reviewable under the APA. The Report itself does not impose any legal consequences but instead simply describes the Special Counsel's findings. *Cf. Joshi v. National Transp. Safety Bd.*, 791 F.3d 8, 10 (D.C. Cir. 2015) (holding a similar agency report not final agency action).

22

And his Privacy Act claim seeking amendment of the Mueller Report fails because the Mueller Report is not contained in a "system of records."

II. Chief Judge Howell reasonably denied Rtskhiladze's request for a copy of his grand jury testimony. As Federal Rule of Criminal Procedure 6(e) reflects, there is a traditional and strong rule in favor of grand jury secrecy. This rule "safeguards vital interests in (1) preserving the willingness and candor of witnesses called before the grand jury; (2) not alerting the target of an investigation who might otherwise flee or interfere with the grand jury; and (3) preserving the rights of a suspect who might later be exonerated." *McKeever v. Barr*, 920 F.3d 842, 844 (D.C. Cir. 2019).

Against that background, Chief Judge Howell correctly determined that Rtskhiladze could not obtain a copy of his transcript unless he demonstrated some sufficient need for it. But Rtskhiladze failed in district court—and fails again in this Court—to articulate any such substantial need for his testimony, much less a need that could overcome the government's and the public's countervailing secrecy interests.

## STANDARD OF REVIEW

This Court reviews a district court's grant of a motion to dismiss de novo. *See Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*, 980 F.3d 109, 114 (D.C. Cir. 2020). This Court reviews a district court's order regarding

23

disclosure of grand jury materials for abuse of discretion. *See In re Sealed Case*, 801 F.2d 1379, 1381 (D.C. Cir. 1986).

## ARGUMENT

**I.    The District Court Properly Dismissed Rtskhiladze's Complaint**

**A.    Rtskhiladze Lacks Standing to Pursue His Claims**

As explained, the gravamen of Rtskhiladze's suit is that Footnote 112 is inaccurate in two specific respects—by referring to him as "Russian" and by omitting the word "some" from his quoted text message—and conveys an inaccurate impression of his general awareness of, or involvement in work to suppress, alleged salacious tapes of President Trump. As an initial matter, Rtskhiladze fails to demonstrate that either the specific inaccuracies or the alleged inaccurate overall impression conveyed by Footnote 112 caused him any injury sufficient to establish standing to pursue any of his claims. And even if he had established some such past injury, he has failed to demonstrate—in light of the release of the Senate Report, which treads much of the same ground in more detail—any ongoing traceable and redressable injury sufficient to establish standing to seek equitable relief.

1. To establish standing, a party must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct,"

and "(3) that is likely to be redressed by a favorable" decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

As the Supreme Court has repeatedly emphasized, to suffice for standing, a plaintiff's injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations and quotation omitted). The Court has further admonished that, in pleading traceability, "much more is needed" when an injury "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Id.* at 562 (quotation omitted). In such a circumstance, the plaintiff "bears the burden of adducing facts showing that those third-party choices have been or will be made in such manner as to produce causation and permit redressability." *Center for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) (quotation and alteration omitted).

Moreover, in the context of claims of reputational injury a plaintiff generally must "produce evidence" demonstrating some tangible consequences of the allegedly defamatory conduct —such as "present and future consequences for [the plaintiff's] business" or "customers [who] have changed

25

their business decisions." *Ezzell Trucking, Inc. v. FMCSA*, 309 F.3d 24, 26 (D.C. Cir. 2002). This showing is necessary to ensure that the plaintiff's alleged injury "is concrete, not speculative," as required by Article III. *Id.*

2. Applying those principles here demonstrates that Rtskhiladze has failed to sufficiently allege that the asserted inaccuracies in Footnote 112 have caused him any injury-in-fact sufficient to support Article III standing. In contending otherwise in district court, Rtskhiladze primarily relied on allegations in his complaint and in a declaration asserting a litany of proposed or contemplated business opportunities that he was forced to forgo. *See* JA __[Dkt.19-1.at.21-25] ¶¶ 52-61, __[Dkt.22-1.at.7-14] ¶¶ 17-32. But Rtskhiladze failed to plausibly allege, much less adduce evidence establishing, that any of those consequences resulted specifically from the challenged conduct: that is, the alleged specific inaccuracies and overall impression created by Footnote 112.

a. As the district court correctly concluded, Rtskhiladze cannot credibly suggest that the specific inaccuracies he identifies in Footnote 112 caused him any tangible harm. *See* JA __[Dkt.32.at.18-19].

First, with respect to his misidentification as Russian, "it is simply not plausible that anyone would have ended a business relationship with Rtskhiladze over what appears to be simply an error regarding his

26

nationality"—particularly given that "his U.S. residency and Georgian background were hardly a secret." JA __[Dkt.32.at.18-19]; *see also id.* (Rtskhiladze's "associates in the business community or in the Georgian government surely would have been aware of his citizenship from their dealings with him and his extensive public presence."). And to the extent that any doubt remained, the Mueller Report (correctly) identifies Rtskhiladze elsewhere as a "U.S.-based executive of" a "Georgian company." *Id.* (quotation omitted). There is thus no credible argument that the mistake regarding his nationality in Footnote 112 has caused him any tangible harm.

Second, it is similarly implausible that the omission of the word "some" in the quoted text message caused Rtskhiladze any harm. As the district court explained, although Rtskhiladze's primary complaint seems to be that the footnote created a misleading impression regarding his knowledge of the contents of the rumored tapes, the "presence or absence of 'some' prior to 'tapes' reveals nothing about the state of Rtskhiladze's knowledge of what the tapes may have depicted." JA __[Dkt.32.at.19]. Nor does Rtskhiladze plead any specific facts to demonstrate that any third party would have responded to the footnote or the Mueller Report any differently depending on whether that text message was quoted accurately.

b. Although the district court correctly recognized that Rtskhiladze has failed to demonstrate any injury stemming from the "specific errors" in Footnote 112, the court concluded that he had plausibly alleged that the "overall impression that the footnote conveys" had caused him injury. JA __[Dkt.32.at.19-20]. Although it was a "close call," the court ultimately concluded that it was "at least plausible" that the "implications contained in the footnote" that linked Rtskhiladze to "a high-profile scandal" related to the rumored salacious tapes may have uniquely caused Rtskhiladze "reputational harm." *Id.* That conclusion was incorrect.

As explained, to demonstrate injury-in-fact in these circumstances, Rtskhiladze must show—with some evidence—that his alleged injuries (generally speaking, others' decisions not to enter into business transactions with him) were caused by the specific challenged conduct. But even assuming Rtskhiladze has sufficiently demonstrated that he lost business opportunities in the period following the Mueller Report, he has offered no evidence to connect those lost opportunities specifically to the allegedly inaccurate "overall impression" conveyed by Footnote 112. That failure is particularly glaring here, where Rtskhiladze's complaint reveals at least three other potential causes.

28

First, as Rtskhiladze's complaint acknowledges, *see* JA __[Dkt.19-1.at.21] ¶ 53, *The New Yorker* published an article in 2017 regarding the Silk Road Group—the company that employed Rtskhiladze, *see* Adam Davidson, *Trump's Business of Corruption*, The New Yorker (Aug. 14, 2017). The district court explained that "Rtskhiladze featured prominently" in that article, which detailed "the Silk Road Group's legally suspect dealings with the Trump Organization." JA __[Dkt.32.at.16]. And Rtskhiladze acknowledges that the article led the Overseas Private Investment Corporation, a government agency that had previously provided the Silk Road Group with a $10 million loan guarantee, to "raise[] concerns" with the company and "question[] whether it should cancel" the guarantee. JA __[Dkt.19-1.at.22] ¶ 54. Indeed, Rtskhiladze alleges that on March 13, 2019—"nine days before Special Counsel Mueller delivered" his report to Attorney General Barr—the Overseas Private Investment Corporation cancelled the loan agreement. JA __[Dkt.19-1.at.23] ¶ 58.

Second, as explained, Rtskhiladze is discussed in a different portion of the Mueller Report. There, the Report spends two paragraphs describing various contacts between Rtskhiladze and Cohen related to a potential Trump Tower project in Moscow. In particular, the Report quotes various communications suggesting that Rtskhiladze had connections with important

29

Russian businessmen and officials, including the Mayor of Moscow and unnamed members "at the highest level of the Russian Government," and proposed to leverage those connections to help advance the project. *See* Mueller Report, Vol. I, at 69-70. Rtskhiladze has not claimed that this portion of the Report conveys any misimpression.

Third, even beyond that, there are portions of Footnote 112 that Rtskhiladze does not (and could not) contend are inaccurate. Although he quibbles with a typographical error in his quoted text message, he does not deny that he texted Michael Cohen in October 2016: "Stopped flow of some tapes from Russia but not sure if there's anything else." JA __[Dkt.19-1.at.15.] ¶ 31.

Taken together, those sources of unchallenged information provide substantially more detail regarding Rtskhiladze's connections with Russia, and they underscore many of the same "implications" that the district court believed might plausibly have caused Rtskhiladze harm: they connect him to various transactions related to the Russian government, the Trump Organization, and specific high-ranking Russian officials and businessmen, and even the admittedly accurate part of Footnote 112 connects him to the alleged salacious tapes.

Particularly given that background, Rtskhiladze's burden to establish injury-in-fact based on others' refusal to do business with him requires him to adduce some evidence that those refusals were the specific result of the alleged inaccuracies in Footnote 112—rather than the result of the article in *The New Yorker*, the discussion in the other portion of the Mueller Report, the accurate portions of Footnote 112, or some combination thereof. And he has failed to produce any such evidence. To the contrary, as the district court explained, at least one of the alleged disrupted transactions—the rescission of the loan guarantee from the Overseas Private Investment Corporation—occurred before the Mueller Report was even released and was instead evidently related to the article in *The New Yorker*. *See* JA __[Dkt.32.at.16-18]. Without some additional factual allegations specifically linking the remaining disrupted transactions to the allegedly inaccurate statements, Rtskhiladze fails to meet his high burden of plausibly alleging that those statements caused him injury through others' actions.

3. Even if Rtskhiladze had shown some previous injury related to the alleged inaccuracies specifically, the district court correctly held that he lacked standing to pursue equitable relief because he has not demonstrated any ongoing traceable or redressable injury. "[S]tanding is not dispensed in gross"; instead, a plaintiff must demonstrate that the standing requirements are met

31

"for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (quotation omitted). Consistent with that principle, this Court has made clear that "past injuries alone are insufficient" to establish jurisdiction for "forward-looking" relief. *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (quotation omitted).

a. As the district court explained, even assuming that the alleged defamatory implication of Footnote 112 uniquely injured Rtskhiladze at the time of publication by drawing a connection between him and the alleged salacious tapes that was not drawn in the other explorations of his ties with Russia, that unique injury dissipated in August 2020 when the Senate Report was released.[2] Like Footnote 112, the Senate Report explores the connection

---

[2] The relevant volume of the Senate Report was released on August 18, 2020, between the time Rtskhiladze moved to amend his complaint (on August 5) and the time the district court granted that motion (on August 31). *See* U.S. Senate Select Committee on Intelligence, *Senate Intel Releases Volume 5 of Bipartisan Russian Report* (Aug. 18, 2020), https://perma.cc/PT65-D9UU; *see also* Dkt. No. 19; Minute Order (Aug. 31, 2020). Presumably because the release occurred before the district court granted the motion, the court conceptualized of the lack of traceability and redressability as undermining Rtskhiladze's standing, and Rtskhiladze has advanced no argument that his standing should be assessed as of August 5, 2020, rather than August 31, 2020. If that were incorrect, however, the same arguments would support dismissing Rtskhiladze's claims for equitable relief as moot, and Rtskhiladze has advanced no argument that turns on the differences between the two doctrines. *Cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167,

*Continued on next page.*

among Rtskhiladze, Cohen, and the alleged tapes, but it does so in significantly more detail. Across three pages, the Senate Report explains that Cohen asked Rtskhiladze in 2014 or 2015 if he "could find out if the tape was real," that Rtskhiladze was alerted to rumors circulating about salacious tapes in 2016, that Rtskhiladze then engaged in a text message exchange with Cohen about the rumor, that Rtskhiladze and Cohen then spoke on the telephone regarding the tape, and that Rtskhiladze was later told (but did not convey to Cohen) that "the tapes were fake." Senate Report 658-60.

Thus, as the district court concluded, all the information contained in Footnote 112—and, indeed, much more information—is similarly contained in the Senate Report. JA __[Dkt.32.at.27]. On the one hand, to the extent that Rtskhiladze plausibly claims any concrete injury from the general connections being drawn in Footnote 112 between him, Cohen, and the alleged tapes, the Senate Report explores those connections in significantly greater detail. Conversely, to the extent that Rtskhiladze's claim is that the Mueller Report injures him by taking his statements out of context, he admits that the Senate Report contains the relevant additional context, including the full text message exchange with Cohen, and he certainly is free to provide that report, with its

---

180-93 (2000) (describing the relationship between standing and mootness); *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008) (a party may forfeit "arguments in favor of subject matter jurisdiction").

details, to any potential business partners or other third parties. Thus, it is implausible that any ongoing injury is traceable to Footnote 112 alone or would be redressed by any equitable relief confined to the Mueller Report. In short, Rtskhiladze fails "to demonstrate a substantial likelihood" that any "third part[ies] directly injuring [him] would cease doing so" if the relief he requests is granted. *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007).

    b. Although the district court dismissed Rtskhiladze's equitable claims for lack of standing, Rtskhiladze barely engages in any analysis of this issue and he does not even attempt to identify any specific ongoing injury attributable to the alleged defamatory material (or redressable by a favorable decision). *See* Rtskhiladze Br. 29-31. Instead, Rtskhiladze barely sketches out two arguments, each devoid of any citation to authority. By failing to engage with the district court's reasoning or the legal principles explained above (and cited by the district court), Rtskhiladze has forfeited any claim to standing. *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005). But his suggested arguments are, in any event, unavailing.

    First, Rtskhiladze contends that, as a matter of law, the Senate Report could not defeat traceability unless it were defamatory. *See* Rtskhiladze Br. 30-31. But Rtskhiladze offers no support for such a blanket rule, which would be

34

inconsistent with the reality that "determining standing is an inherently fact-specific inquiry." *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 302 (2d Cir. 2021). And on the facts, Rtskhiladze does not argue—beyond stating that he considers the Mueller Report defamatory and the Senate Report accurate—that there is any meaningful difference between the portrayals of his conduct in the two sources. Therefore, as the district court explained, he "cannot show" that any alleged "ongoing injuries are caused by Footnote 112" rather than by the Senate Report, and he fails to demonstrate traceability. JA __[Dkt.32.at.27].

In any event, even if Rtskhiladze could show some daylight between the admittedly correct impression created by the Senate Report and the allegedly defamatory impression created by Footnote 112, that would not be sufficient to demonstrate traceability or redressability. Instead, as explained above, Rtskhiladze bears the burden of plausibly alleging sufficient facts to establish a concrete, ongoing harm from the alleged defamation; to meet that burden in light of the Senate Report, Rtskhiladze would need to explain how any daylight between the two impressions has concrete effects on him—for example, that some business associate is unwilling to work with him because of the allegedly defamatory parts of Footnote 112 but would not be unwilling to work with him as a result of the Senate Report. Not only is it implausible

35

that any such concrete effects exist (given, as explained above, the substantial overlap between the two), but Rtskhiladze has not even attempted to identify them in his brief.

Second, Rtskhiladze contends that the Senate Report cannot render his injury non-redressable, seemingly because he believes a plaintiff must be able to sue over a defamatory statement regardless of whether other third parties are also defaming the plaintiff or are instead broadcasting true information about him. *See* Rtskhiladze Br. 31. That suggestion too is incorrect as applied here. As an initial matter, Rtskhiladze again fails to engage with the careful, fact-specific reasoning of the district court, nor does he identify any evidence to suggest that the equitable relief he seeks here would actually redress his alleged injuries.

Moreover, regardless of how the standing analysis might play out in Rtskhiladze's hypotheticals regarding, for example, defamation suits against Fox News and *The New York Times*, *see* Rtskhiladze Br. 31, those hypotheticals are inapposite. In such a suit, a plaintiff seeking damages for past injuries would be able to establish standing for that relief regardless of whether it could identify any ongoing remediable injury. In addition, a plaintiff who suffers ongoing harm from multiple parties' allegedly defamatory statements might well have standing to seek equitable relief against each party in separate suits,

36

on the theory that each suit will, if successful, remove a separate "barrier" to ultimately redressing his injury. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977). Here, however, Rtskhiladze does not (and could not) aver that he separately intends to seek equitable relief with respect to the Senate Report; to the contrary, he admits the Senate Report's accuracy. Thus, regardless of what happens in this suit or future suits, the Senate Report's description of Rtskhiladze's conduct will remain in the public domain, and (as explained) Rtskhiladze thus cannot show that any of his alleged ongoing injuries would be redressed.

## B.    Rtskhiladze Failed to Plausibly State a Claim for Damages

In order to maintain any claim for damages under the Privacy Act, a plaintiff must demonstrate that the agency's failure to comply with the Act's provisions was "intentional or willful." 5 U.S.C. § 552a(g)(4). As the district court correctly held, Rtskhiladze failed to plausibly plead that the alleged inaccuracies in Footnote 112 were "intentional or willful" and so has not stated a claim for damages.

1. As this Court has explained, the Privacy Act "does not make the Government strictly liable for every affirmative or negligent action that might be said technically to violate the Privacy Act's provisions." *Albright v. United States*, 732 F.2d 181, 189 (D.C. Cir. 1984). Instead, the Act permits

37

maintenance of a damages claim "only when the agency acts in violation of the Act in a willful or intentional manner, either by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act." *Id.* Under this standard, it is not enough "that the government handled a matter in a disjointed, or confused manner." *Maydak v. United States*, 630 F.3d 166, 180 (D.C. Cir. 2010) (quotation omitted). Instead, a "violation of the statute must be so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful." *Id.* at 179 (quotation omitted).

As the district court correctly concluded, the allegations in Rtskhiladze's complaint fall far short of this demanding standard. Indeed, the only specific material in the complaint that possibly speaks to the agency's intent in drafting Footnote 112 is a set of allegations that "Special Counsel Mueller and the special prosecutors working for him" generally were aware that Rtskhiladze "is a native of Georgia, not Russia," that he "has resided in the United States since 1991," and that Georgia and Russia have "a strained relationship." JA __[Dkt.19-1.at.14-15] ¶ 30. But those allegations fail to plausibly establish that the misidentification as Russian was intentional or willful—much less do they establish anything about the agency's intent with respect to the other alleged inaccuracies in Footnote 112.

38

The drafting of the Mueller Report represented an enormous and complicated undertaking. As explained, the relevant portions of Footnote 112 consist of a few sentences buried in the middle of a nearly 450-page report summarizing evidence uncovered over a years-long investigation. Indeed, Rtskhiladze alleges that he alone "produced approximately 25,000 pages of documents" in connection with the investigation. JA __[Dkt.19-1.at.12] ¶ 26. In that context, bare allegations that some members of the Special Counsel's team would have—if they had specifically considered the question—remembered that Rtskhiladze was Georgian, not Russian, fail to plausibly demonstrate that the misidentification was anything more than an inadvertent drafting error.

Beyond that failure to plead sufficient facts to establish the required mental state, the nature of the alleged inaccuracies makes clear the implausibility of any suggestion that they were the product of intentional or willful conduct. For one, as the district court explained, the "only clear factual errors uniquely present in the text of Footnote 112"—the misidentification of Rtskhiladze as Russian and the omission of the word "some"—are "much more obvious[ly]" explained as "mere drafting error[s]" than as the product of some "intentional malfeasance." JA __[Dkt.32.at.29]. That conclusion is underscored by the Mueller Report's (correct) identification of him as a "U.S.-

39

based executive of [a] Georgian company," Mueller Report, Vol. I, at 70

n.313. Rtskhiladze offers, in particular, no plausible explanation for why the

Special Counsel would have intentionally misidentified him as Russian in

Footnote 112 while correctly identifying his residence elsewhere.

Moreover, Rtskhiladze's admission that the Senate Report is accurate

"dooms any plausible inference of intentional disregard of his rights" with

respect to the alleged overall misimpression generated by Footnote 112. JA

__[Dkt.32.at.28]. As the district court explained, "the Senate Report contains

the same (and in some cases substantially worse) facts and implications

regarding Rtskhiladze's conduct surrounding the tapes." JA __[Dkt.32.at.29].

Thus, "any miniscule differences in content are not plausibly attributable to"

intentional or willful misconduct but instead are "most consistent with some

careless drafting." *Id.*

2. Rtskhiladze does not directly engage with the district court's

reasoning, nor does he identify any specific factual allegations in his complaint

that might support the inference that the alleged inaccuracies were

intentionally or willfully inserted into the Mueller Report. *See* Rtskhiladze Br.

22-29. Instead, Rtskhiladze primarily argues (at 22-28) that he does not need to

meet that statutory standard but instead need only plead "that the [challenged]

language, as a matter of law, be reasonably capable of a defamatory meaning."

40

And he briefly suggests in the alternative (at 28-29) that some facts outside of his complaint might support an inference of intent. Neither argument is availing.

First, Rtskhiladze relies on a series of cases regarding the common law tort of defamation by implication to argue that he need not plead that the agency's conduct was intentional or willful. According to Rtskhiladze, in such a case, "lack of intent is not a defense" and if the alleged defamatory language "is reasonably capable of a defamatory interpretation, the issue cannot be decided on a motion to dismiss." *See* Rtskhiladze Br. 22-27. But Rtskhiladze's claim is not a common-law tort claim, *cf.* 28 U.S.C. § 2680(h) (generally providing that the Federal Tort Claims Act does not waive the United States' sovereign immunity for claims of libel or slander), and his attempt to import a common law tort intent standard into the Privacy Act fails on all levels.

As an initial matter, Rtskhiladze failed to raise any such argument in district court and thus it is forfeited. *See* JA __[Dkt.22.at.34-36]; *see also Figueroa v. District of Columbia Metro. Police Dep't*, 633 F.3d 1129, 1133 n.3 (D.C. Cir. 2011). In any event, Rtskhiladze's argument finds no purchase in the Privacy Act or this Court's case law. As explained, the statute makes clear that no damages action may be maintained unless the agency "acted in a manner which was intentional or willful," 5 U.S.C. § 552a(g)(4), and that provision

41

does not admit of any exception based on how a plaintiff might characterize the alleged inaccuracy. Consistent with that statutory language, this Court's cases have long explained that "proof of intent or willfulness is a necessary element of" Privacy Act damages claims. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007); *see also, e.g.*, *Maydak*, 630 F.3d at 179-80; *Albright*, 732 F.2d at 189. Rtskhiladze's brief, unsupported suggestion that "[s]urely, Congress did not intend proof that harm done 'willfully or intentionally' under the Privacy Act be more onerous than what is required in a defamation by implication case in the same jurisdiction," Rtskhiladze Br. 27, does not engage with that statutory language or this Court's cases interpreting it and provides no basis to reverse.

Beyond that, Rtskhiladze speculates—relying on material that he says is addressed in his motion for reconsideration in district court—that "discovery would reveal" that one of the prosecutors on the Special Counsel's team "had personal, professional, and political ties to the Democratic Party's 2016 presidential candidate, Hillary Clinton," and that such ties constitute "motive" to defame him. Rtskhiladze Br. 28-29.

That speculation is unavailing. Rtskhiladze did not include any allegations along these lines in his complaint, nor did he make any similar arguments in response to the government's motion to dismiss. Thus, he cannot

42

now rely on them to attack the district court's dismissal of his complaint. In

any event, Rtskhiladze utterly fails to connect the dots between one member of

the Special Counsel's team having ties to Ms. Clinton and the conclusion that

the agency intentionally or willfully included inaccurate information about

him in Footnote 112. Nothing about these new allegations undermines the

district court's correct conclusion that he has failed to plausibly plead any

intentional or willful misconduct on the part of the agency.[3]

## C.     Rtskhiladze's Equitable Claims Independently Fail for Additional Reasons

As explained, *see supra* pp. 31-37, the district court correctly held that

Rtskhiladze lacks standing to pursue his claims for equitable relief. But even if

Rtskhiladze did have standing for those claims, they would each fail for

independent reasons. First, his claim under the APA would fail because the

Mueller Report does not constitute final agency action reviewable under the

APA. Second, his equitable claim under the Privacy Act would fail because the

Mueller Report is not maintained by the Department in a system of records,

---

[3] As explained, the district court dismissed Rtskhiladze's separate *Bivens* claim, seeking damages under the Fifth Amendment against Special Counsel Mueller in his individual capacity, primarily on the ground that Rtskhiladze's briefing failed to "oppose the arguments for dismissal." JA __[Dkt.32.at.30-32]. Rtskhiladze has not raised any challenge to this dismissal in his opening brief and thus forfeited any such argument. *See American Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008).

which is a necessary predicate for seeking equitable relief under the Privacy Act.

1. Rtskhiladze's APA claim fails because the Mueller Report is not "final agency action," 5 U.S.C. § 704, reviewable under the APA. An action is "final" only if it represents "the consummation of the agency's decisionmaking process" and determines legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation omitted).

Because the Mueller Report does not determine any legal rights or obligations, it is not final. It is indisputable that the Report itself is simply a description of the investigation undertaken by the Special Counsel and the facts unearthed by that investigation. The Report "imposes no obligations, prohibitions, or restrictions; it compels action by neither the recipient nor the agency." *Valero Energy Corp. v. EPA*, 927 F.3d 532, 536 (D.C. Cir. 2019) (quotation omitted). Instead, "it leaves the world just as it found it." *Id.* Moreover, beyond having no legal effect, the Report also "does not impose an immediate and significant practical burden on regulated parties" by, for example, putting them to a "painful choice between costly compliance and the risk of prosecution at an uncertain point in the future." *Id.* at 537 (quotation omitted). Instead, again, the Report simply describes the Special Counsel's

44

findings, without levying any concomitant obligations or burdens on third parties.

Consistent with those principles, this Court concluded in *Joshi v. National Transportation Safety Board*, 791 F.3d 8, 10 (D.C. Cir. 2015), that a similar agency report was not final agency action. There, the Board investigated an airplane crash and then released a report that "gave a brief summary of the accident and concluded that it was likely the product of the pilot's actions during the approach to landing." *Id.* at 10. The pilot's father attempted to challenge the report's finding under a provision of the Federal Aviation Act providing for review of final orders, and this Court rejected the suit on the ground that the report was not a reviewable final order. In reaching that conclusion, the Court rejected the father's argument that "various consequences have resulted from" the report, "including reputational harm, financial harm, emotional harm, and informational harm," explaining that "these are practical consequences, not legal harms that can transform" the report "into a final agency order." *Id.* at 11-12; *see also, e.g.*, *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998) (holding that an agency report submitted to Congress did not constitute final agency action because "no legal consequences flow[ed]" from it and it was instead "purely informational").

45

2. Rtskhiladze's claim seeking equitable relief—that is, an amendment of the Mueller Report—under the Privacy Act fails because the Mueller Report is not contained within a "system of records." As explained, the relevant provision of the Privacy Act provides that an individual may seek equitable relief when an agency "makes a determination under [5 U.S.C. § 552a(d)(3)] not to amend an individual's record in accordance with his request." 5 U.S.C. § 552a(g)(1)(A). But § 552a(d)(3) allows an individual to request an amendment of his record only if that record is maintained in a "system of records." *See id.* § 552a(d)(3) ("Each agency that maintains a system of records shall . . ."); *see also Henke v. U.S. Dep't of Commerce*, 83 F.3d 1453, 1459 (D.C. Cir. 1996) ("[T]he determination that a system of records exists triggers virtually all of the other substantive provisions of the Privacy Act, such as an individual's right . . . to request amendment of her records."). The Mueller Report does not qualify and thus Rtskhiladze cannot sustain his equitable Privacy Act claim.

As explained, the Privacy Act defines a "system of records" to mean "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). As this Court has explained, a "system of records exists only if

46

the information contained within the body of material is both retrievable by personal identifier and actually retrieved by personal identifier," *Paige v. DEA*, 665 F.3d 1355, 1359 (D.C. Cir. 2012) (quotation and emphasis omitted)—as, for example, when information is contained within a database that an agency searches with personal identifiers like names or assigned numbers to retrieve files connected to that specific individual.

Here, however, in rejecting Rtskhiladze's administrative claim under the Privacy Act, the Department of Justice confirmed that the Mueller Report "is not maintained in a system of records from which information is retrieved using a personal identifier." JA __[Dkt.20-1.at.11]; *see also* JA__[Dkt.20-1.at.2-3]. And Rtskhiladze has failed to allege any facts suggesting that the Department's determination on that score was incorrect. Indeed, to the contrary, in arguing in district court that he could proceed with his APA claim, Rtskhiladze suggested that the equitable provisions of the Privacy Act in fact did not provide him a cause of action because they do not apply to "records held outside of a 'system of records.'" *See* Dkt. No. 22, at 30-32. Thus, Rtskhiladze has failed to plausibly state a claim for equitable relief under the Privacy Act.[4]

---

[4] In district court, Rtskhiladze appeared to suggest that he could maintain a claim for equitable Privacy Act relief under the causes of action

*Continued on next page.*

## II.     Chief Judge Howell Reasonably Denied Rtskhiladze's Request for an Unrestricted Copy of His Grand Jury Testimony

Chief Judge Howell granted Rtskhiladze's request for permission to review a copy of the transcript of his grand jury testimony in connection with a filing he intended to make in his civil case. Nevertheless, Rtskhiladze complains that Chief Judge Howell rejected his additional request that he be provided, and permitted to retain and disclose, an unrestricted copy of the transcript. But Rtskhiladze has failed to provide any reasonable justification for his request, particularly in light of the well-recognized countervailing interests in grand jury secrecy, and Chief Judge Howell thus acted well within her discretion in denying it.

1. a. Federal Rule of Criminal Procedure 6(e) "codifies the traditional rule of grand jury secrecy" in several ways. *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 425 (1983). Most importantly, Rule 6(e)(2), titled "Secrecy," imposes a flat prohibition against the disclosure of any grand jury matter by a non-

---

described in 5 U.S.C. § 552a(g)(1)(C)-(D), which are not predicated on the maintenance of a record in a system of records. But the Privacy Act makes clear that only the causes of action described in § 552a(g)(1)(A)-(B) give rise to claims for equitable relief; the only relief available for a claim under § 552a(g)(1)(C)-(D) is damages for intentional or willful violations. *See* 5 U.S.C. § 552a(g)(2)-(4); *see also Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988) ("The [Privacy] Act's subsection on civil remedies authorizes entry of injunctive relief in only two specific situations. *See* [5 U.S.C. § 552a(g)(2)(A)-(B)]. In so doing, as we have held, the Act precludes other forms of declaratory and injunctive relief . . . .").

witness participant in a grand jury proceeding "[u]nless these rules provide otherwise." Rule 6(e)(2)(B). To effectuate this general rule, any transcripts or recordings created during the course of the proceeding are held by default in the custody of the government attorneys involved. *See* Rule 6(e)(1).

Authorized disclosures of grand jury materials, in turn, are covered in Rule 6(e)(3), which contains most of the circumstances in which "these rules provide" for disclosure of grand jury materials. As relevant here, one subgroup of exceptions specifies that a district court "may authorize disclosure . . . of a grand-jury matter" in five enumerated circumstances, including when requested "preliminarily to or in connection with a judicial proceeding." Rule 6(e)(3)(E)(i).

As Rule 6(e) underscores, secrecy, not disclosure, is the norm. A district court is not required to approve any request to disclose grand jury records, and the court retains broad discretion to impose conditions on the manner and extent of any disclosure permitted by the Rule. *See* Rule 6(e)(3)(E) (providing the court may authorize disclosure "at a time, in a manner, and subject to any other conditions that it directs"). Parties seeking disclosure of grand jury materials under one of the exceptions generally must demonstrate a particularized need for the materials, and the district court must determine whether, in light of that showing, disclosure is appropriate. *See Sells Eng'g*, 463

49

U.S. at 443; *see also In re Sealed Case*, 250 F.3d 764, 771 (D.C. Cir. 2001).

Whether to order disclosure under these circumstances is "committed to the

discretion of the trial judge," as "declar[ed]" by the text of Rule 6(e). *Pittsburgh*

*Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959).

b. Rule 6(e)'s strong bias in favor of maintaining the secrecy of grand

jury materials reflects important interests of the government and the public. As

this Court has explained, grand jury secrecy rules "safeguard[] vital interests in

(1) preserving the willingness and candor of witnesses called before the grand

jury; (2) not alerting the target of an investigation who might otherwise flee or

interfere with the grand jury; and (3) preserving the rights of a suspect who

might later be exonerated." *McKeever v. Barr*, 920 F.3d 842, 844 (D.C. Cir.

2019).

These considerations apply with significant force not only when a third

party seeks access to grand jury material but also when a witness seeks

unrestricted access to a transcript of his own testimony, notwithstanding the

fact that a grand jury witness is "not under an obligation of secrecy" and "can

stand on the courthouse steps and tell the public everything [he] was asked and

answered." *In re Grand Jury*, 490 F.3d 978, 985, 989 (D.C. Cir. 2007) (per

curiam). Perhaps most importantly, "a rule of automatic access would expose

grand jury witnesses to potential intimidation by making it possible for those

50

with power over the witness to monitor his or her testimony." *United States v. John Doe, Inc. I*, 481 U.S. 102, 125 (1987) (Brennan, J., dissenting) (quotation omitted). In other words, if a witness were generally entitled to receive a copy of his own transcript and disseminate it to others, a third party seeking to control the witness's testimony could force the witness to obtain the transcript and provide it to the third party for his review. And the fear of such consequences might well deter the witness from testifying truthfully and fully in the first place. *See In re Grand Jury*, 490 F.3d at 989-90 (describing this concern as one where the government "is on firmer ground," although ultimately declining to address how the concern might factor into the analysis in these circumstances).

In addition, the remaining secrecy interests protected by Rule 6(e) continue to play a significant role even in the context of a witness's own testimony. In many cases, of course, the prosecutor will ask, and a grand jury witness will testify, about potential criminal behavior of third parties. The government and the third party thus maintain a strong interest in maintaining the secrecy of such exchanges. And although a witness may be free to publicly allege that he was asked questions about, or provided information regarding, a particular topic or person, those public allegations will generally remain unverified and subject to any doubts regarding the witness's memory or

51

truthfulness. By contrast, requiring the disclosure of a transcript will confirm the exact content of the prosecutor's questions and the witness's answers, heightening any incentive that third parties discussed in the testimony may have to flee or destroy evidence and magnifying the intrusion on any third party's privacy interests. It is also possible that a third party about whom a witness testifies could infer additional information about the prosecution's case—including, for example, information about the other witnesses and evidence the prosecution has presented to the grand jury—based on the specific questions that the prosecutor asks, even if the witness might not himself be in a position to connect the dots in that way. More broadly, if every grand jury witness could routinely obtain and disseminate transcripts of their testimony, it would significantly undermine the "vital secrecy" on which "'the proper functioning of our grand jury system depends.'" *Rehberg v. Paulk*, 566 U.S. 356, 374 (2012) (quotation omitted).

Taken together, those concerns—which are reflected to some extent in Rule 6(e)'s decision not to provide a standalone exception for disclosure to a witness of her own testimony—make clear that there are significant government and public interests in grand jury secrecy in this context. Nevertheless, as Chief Judge Howell noted, there is some suggestion in this Court's cases that the particularized need standard that generally applies to

52

Rule 6(e) requests may not be appropriate where a witness seeks access to a copy of his own testimony because of the altered nature of the competing interests in that context. *See* JA __[Dkt.20.at.5-6]. But because the interests underlying the grand jury secrecy rules nonetheless apply with significant force in this context, this Court need not determine the precise articulation of the appropriate standard. As Chief Judge Howell explained, Rtskhiladze's request would fail under any reasonable standard. *See id.*

c. Chief Judge Howell reasonably rejected Rtskhiladze's request for an unrestricted copy of the transcript of his grand jury testimony.

As an initial matter, Chief Judge Howell correctly concluded, as the government agreed, that Rtskhiladze's request properly invoked the exception contained in Rule 6(e)(3)(E)(i) for requests preliminary to, or in connection with, another judicial proceeding, because Rtskhiladze articulated that he wanted a copy of his transcript in connection with his contemplated filing of a Rule 60 motion and his contemplated appeal in his civil case. *See* JA __[Dkt.20.at.9-10]. Nevertheless, as explained, that showing established only that Chief Judge Howell has the authority to order the requested disclosure; it did not establish that Rtskhiladze has any right to disclosure, nor did it absolve him of demonstrating some need for the material.

At that step of the analysis, Chief Judge Howell correctly concluded that Rtskhiladze had failed to demonstrate any need for an unrestricted copy of his transcript and that the countervailing secrecy interests justified declining to authorize disclosure. Rtskhiladze failed before Chief Judge Howell to articulate any explanation for why he needed an unrestricted copy of his transcript, particularly given that he had already been permitted to access the transcript for purposes of preparing his motion for reconsideration in the civil case. Instead, he argued primarily that he had previously been deprived of access to the transcript. Chief Judge Howell correctly concluded that argument was not "germane to [Rtskhiladze's] request for something new—an unrestricted transcript copy—after [he] received the desired access." *See* JA __[Dkt.20.at.6-8]. As explained, that lack of any showing of need dooms Rtskhiladze's request, in light of the general interests in grand jury secrecy embodied in Rule 6(e).

In any event, Chief Judge Howell also reasonably credited as countervailing interests the government's "ongoing criminal and national security matters that arose from the Special Counsel's investigation" and Rtskhiladze's own previous failures to comply with the court's restrictions on the use of grand jury material. JA __[Dkt.20.at.8]. Those interests "far

54

outweigh[] the dearth of any showing by" Rtskhiladze, *id.*, and thus Chief

Judge Howell reasonably denied Rtskhiladze's request.

2. Rtskhiladze does not contend that he can demonstrate any substantial

need for an unrestricted copy of the transcript. Nor does he take issue with

Chief Judge Howell's determination that the countervailing secrecy interests

identified by the government outweighed any interests he had proffered.

Instead, Rtskhiladze primarily contends (at 32-34) that this Court's cases

establish a rule that he is entitled to an unrestricted copy of his transcript unless

the government can demonstrate a "compelling" reason to deny his request.

But neither of the cases he cites stands for the proposition that the general Rule

6(e) framework—which, as explained, requires the party seeking access to

grand jury material to demonstrate some need for that material—does not

apply in this context.

First, Rtskhiladze (at 32) points to a statement in *In re Sealed Motion*, 880

F.2d 1367, 1370-71 (D.C. Cir. 1989) (per curiam), that a grand jury witness

mentioned in a report produced under the Independent Counsel Act "is

entitled to a transcript of his own testimony absent a clear showing by the

government that other interests outweigh the witness's right to such

transcript." As Chief Judge Howell explained, however, *In re Sealed Motion* is

inapplicable here because it "was narrowly tailored to the context of a witness

55

before a grand jury convened pursuant to the Independent Counsel Act." JA

__[Dkt.26.at.8]. The Independent Counsel Act was "*sui generis* in many

aspects," including that it "specially direct[ed] the court to protect the rights of

any individual named in" an Independent Counsel's report and, relatedly, that

it authorized the court to disclose portions of the report to any individual

named in the report before publication and to include responsive comments

from those individuals as an appendix to the report. *In re Sealed Motion*, 880

F.2d at 1368-69 (quotation omitted). For that reason, the Court in *Sealed*

*Motion* rejected the Independent Counsel's argument that "the rule applicable

to ordinary criminal proceedings applies to the instant case," because that

argument did "not give adequate consideration to the *sui generis* nature of the

Independent Counsel Act and its specific provisions." *Id.* at 1368. Consistent

with that reasoning, the Court made clear its limited "hold[ing] that" a "grand

jury 'witness' in an independent counsel proceeding" is "entitled to a copy of

his testimony." *Id.*

     In this context, by contrast, the regulations governing the Office of the

Special Counsel contain no such similar provision authorizing the court to

disclose the report to, and accept comments from, individuals named in the

report. Thus, as Chief Judge Howell concluded, "the specific feature of the

[Independent Counsel Act] that supported the conclusion in *In re Sealed*

*Motion*—by supplying a tangible reason a grand jury witness may need a copy of his own transcript—has no analogue in the current Special Counsel regulations." JA __[Dkt.26.at.10]. And more generally, nothing in the Special Counsel regulations parallels the provision of the Independent Counsel Act charging the court with an affirmative obligation to protect any intangible rights of third parties, nor do (or could) those regulations override the general framework established by Rule 6(e) governing such requests.

Second, Rtskhiladze cites (at 32-33) statements in *In re Grand Jury*, 490 F.3d at 985, suggesting that the grand jury's secrecy privilege belongs to the witness as supporting the proposition that the burden to justify non-disclosure rests on the government. But *In re Grand Jury* itself makes clear that it was only addressing the question whether the applicants could review the transcript of their testimony in private—which Rtskhiladze was permitted to do—and that it was not "resolv[ing] the issue of whether witnesses also have a right to obtain a copy of the transcripts." *Id.* at 990. Indeed, as explained above, the Court there explicitly suggested that the concerns underlying grand jury secrecy might well provide firmer support for declining to provide such a copy. There is thus no basis for overreading *In re Grand Jury* to support establishing an exception to the usual grand-jury secrecy rules in this context.

Finally, Rtskhiladze briefly suggests (at 34-35) that "fundamental fairness," as reflected in the evidentiary rule of completeness, requires that the government publicly release his entire transcript because the government has "opened th[e] door" by "releas[ing] a portion of [Rtskhiladze's] grand jury testimony in Footnote 112." That suggestion is incorrect both factually and legally. As a factual matter, Footnote 112 does not include any material derived from Rtskhiladze's grand jury testimony; indeed, the Mueller Report throughout reflects redactions to protect Rule 6(e) material. Instead, the material in Footnote 112 relating to Rtskhiladze comes from his text messages and from his interviews with the government. *See* Mueller Report, Vol. II, at 27 n.112. And as a legal matter, Rule 6(e) does not provide any categorical right to disclosure based on either general principles of fairness or the rules of evidence. Rtskhiladze's attempt to rely on those principles to generate such a categorical right runs headlong into this Court's recognition that Rule 6(e)'s reticulated scheme provides the exclusive bases for disclosing grand jury material. *See McKeever*, 920 F.3d at 844-47.

58

## CONCLUSION

For the foregoing reasons, the judgments of the district courts should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

MICHAEL S. RAAB

 */s/ Sean R. Janda*
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

May 2023

59

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,766 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Calisto MT 14-point font, a proportionally spaced typeface.

*/s/ Sean R. Janda*
Sean R. Janda

**ADDENDUM**

## TABLE OF CONTENTS

5 U.S.C. § 552a(a)(1)-(5), (d)-(g) ................................................................. A1

Fed. R. Crim. P. 6(e) ................................................................................ A7

## 5 U.S.C. § 552a

## § 552a. Records maintained on individuals

(a) DEFINITIONS.—For purposes of this section—

(1) the term "agency" means agency as defined in section 552(e) of this title;

(2) the term "individual" means a citizen of the United States or an alien lawfully admitted for permanent residence;

(3) the term "maintain" includes maintain, collect, use, or disseminate;

(4) the term "record" means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph;

(5) the term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual;

. . .

(d) ACCESS TO RECORDS.—Each agency that maintains a system of records shall—

(1) upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him and upon his request, a person of his own choosing to accompany him, to review the record and have a copy made of all or any portion thereof in a form comprehensible to him, except that the agency may require the individual to furnish a written statement authorizing discussion of that individual's record in the accompanying person's presence;

(2) permit the individual to request amendment of a record pertaining to him and—

(A) not later than 10 days (excluding Saturdays, Sundays, and legal public holidays) after the date of receipt of such request, acknowledge in writing such receipt; and

(B) promptly, either—

(i) make any correction of any portion thereof which the individual believes is not accurate, relevant, timely, or complete; or

(ii) inform the individual of its refusal to amend the record in accordance with his request, the reason for the refusal, the procedures established by the agency for the individual to request a review of that refusal by the head of the agency or an officer designated by the head of the agency, and the name and business address of that official;

(3) permit the individual who disagrees with the refusal of the agency to amend his record to request a review of such refusal, and not later than 30 days (excluding Saturdays, Sundays, and legal public holidays) from the date on which the individual requests such review, complete such review and make a final determination unless, for good cause shown, the head of the agency extends such 30-day period; and if, after his review, the reviewing official also refuses to amend the record in accordance with the request, permit the individual to file with the agency a concise statement setting forth the reasons for his disagreement with the refusal of the agency, and notify the individual of the provisions for judicial review of the reviewing official's determination under subsection (g)(1)(A) of this section;

(4) in any disclosure, containing information about which the individual has filed a statement of disagreement, occurring after the filing of the statement under paragraph (3) of this subsection, clearly note any portion of the record which is disputed and provide copies of the statement and, if the agency deems it appropriate, copies of a concise statement of the reasons of the agency for not making the amendments requested, to persons or other agencies to whom the disputed record has been disclosed; and

(5) nothing in this section shall allow an individual access to any information compiled in reasonable anticipation of a civil action or proceeding.

(e) AGENCY REQUIREMENTS.—Each agency that maintains a system of records shall—

(1) maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President;

(2) collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs;

A2

(3) inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual—

(A) the authority (whether granted by statute, or by executive order of the President) which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary;

(B) the principal purpose or purposes for which the information is intended to be used;

(C) the routine uses which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection; and

(D) the effects on him, if any, of not providing all or any part of the requested information;

(4) subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records, which notice shall include—

(A) the name and location of the system;

(B) the categories of individuals on whom records are maintained in the system;

(C) the categories of records maintained in the system;

(D) each routine use of the records contained in the system, including the categories of users and the purpose of such use;

(E) the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;

(F) the title and business address of the agency official who is responsible for the system of records;

(G) the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;

(H) the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and

(I) the categories of sources of records in the system;

(5) maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness,

and completeness as is reasonably necessary to assure fairness to the individual in the determination;

(6) prior to disseminating any record about an individual to any person other than an agency, unless the dissemination is made pursuant to subsection (b)(2) of this section, make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes;

(7) maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity;

(8) make reasonable efforts to serve notice on an individual when any record on such individual is made available to any person under compulsory legal process when such process becomes a matter of public record;

(9) establish rules of conduct for persons involved in the design, development, operation, or maintenance of any system of records, or in maintaining any record, and instruct each such person with respect to such rules and the requirements of this section, including any other rules and procedures adopted pursuant to this section and the penalties for noncompliance;

(10) establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained;

(11) at least 30 days prior to publication of information under paragraph (4)(D) of this subsection, publish in the Federal Register notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency; and

(12) if such agency is a recipient agency or a source agency in a matching program with a non-Federal agency, with respect to any establishment or revision of a matching program, at least 30 days prior to conducting such program, publish in the Federal Register notice of such establishment or revision.

(f) AGENCY RULES.—In order to carry out the provisions of this section, each agency that maintains a system of records shall promulgate rules, in

A4

accordance with the requirements (including general notice) of section 553 of this title, which shall—

(1) establish procedures whereby an individual can be notified in response to his request if any system of records named by the individual contains a record pertaining to him;

(2) define reasonable times, places, and requirements for identifying an individual who requests his record or information pertaining to him before the agency shall make the record or information available to the individual;

(3) establish procedures for the disclosure to an individual upon his request of his record or information pertaining to him, including special procedure, if deemed necessary, for the disclosure to an individual of medical records, including psychological records, pertaining to him;

(4) establish procedures for reviewing a request from an individual concerning the amendment of any record or information pertaining to the individual, for making a determination on the request, for an appeal within the agency of an initial adverse agency determination, and for whatever additional means may be necessary for each individual to be able to exercise fully his rights under this section; and

(5) establish fees to be charged, if any, to any individual for making copies of his record, excluding the cost of any search for and review of the record.

The Office of the Federal Register shall biennially compile and publish the rules promulgated under this subsection and agency notices published under subsection (e)(4) of this section in a form available to the public at low cost.

(g)(1) CIVIL REMEDIES.—Whenever any agency

(A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;

(B) refuses to comply with an individual request under subsection (d)(1) of this section;

(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on

the basis of such record, and consequently a determination is made which is adverse to the individual; or

   (D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,

the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

   (2)(A) In any suit brought under the provisions of subsection (g)(1)(A) of this section, the court may order the agency to amend the individual's record in accordance with his request or in such other way as the court may direct. In such a case the court shall determine the matter de novo.

   (B) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this paragraph in which the complainant has substantially prevailed.

   (3)(A) In any suit brought under the provisions of subsection (g)(1)(B) of this section, the court may enjoin the agency from withholding the records and order the production to the complainant of any agency records improperly withheld from him. In such a case the court shall determine the matter de novo, and may examine the contents of any agency records in camera to determine whether the records or any portion thereof may be withheld under any of the exemptions set forth in subsection (k) of this section, and the burden is on the agency to sustain its action.

   (B) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this paragraph in which the complainant has substantially prevailed.

   (4) In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of—

   (A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and

   (B) the costs of the action together with reasonable attorney fees as determined by the court.

A6

(5) An action to enforce any liability created under this section may be brought in the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, without regard to the amount in controversy, within two years from the date on which the cause of action arises, except that where an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section, the action may be brought at any time within two years after discovery by the individual of the misrepresentation. Nothing in this section shall be construed to authorize any civil action by reason of any injury sustained as the result of a disclosure of a record prior to September 27, 1975.

## Fed. R. Crim. P. 6(e)

**(e) Recording and Disclosing the Proceedings.**

**(1)** *Recording the Proceedings.* Except while the grand jury is deliberating or voting, all proceedings must be recorded by a court reporter or by a suitable recording device. But the validity of a prosecution is not affected by the unintentional failure to make a recording. Unless the court orders otherwise, an attorney for the government will retain control of the recording, the reporter's notes, and any transcript prepared from those notes.

**(2)** *Secrecy.*

(A) No obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B).

(B) Unless these rules provide otherwise, the following persons must not disclose a matter occurring before the grand jury:

(i) a grand juror;

(ii) an interpreter;

(iii) a court reporter;

(iv) an operator of a recording device;

(v) a person who transcribes recorded testimony;

(vi) an attorney for the government; or

(vii) a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii).

**(3)** *Exceptions.*

(A) Disclosure of a grand-jury matter—other than the grand jury's deliberations or any grand juror's vote—may be made to:

(i) an attorney for the government for use in performing that attorney's duty;

(ii) any government personnel—including those of a state, state subdivision, Indian tribe, or foreign government—that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law; or

(iii) a person authorized by 18 U.S.C. § 3322.

(B) A person to whom information is disclosed under Rule 6(e)(3)(A)(ii) may use that information only to assist an attorney for the government in performing that attorney's duty to enforce federal criminal law. An attorney for the government must promptly provide the court that impaneled the grand jury with the names of all persons to whom a disclosure has been made, and must certify that the attorney has advised those persons of their obligation of secrecy under this rule.

(C) An attorney for the government may disclose any grand-jury matter to another federal grand jury.

(D) An attorney for the government may disclose any grand-jury matter involving foreign intelligence, counterintelligence (as defined in 50 U.S.C. § 3003), or foreign intelligence information (as defined in Rule 6(e)(3)(D)(iii)) to any federal law enforcement, intelligence, protective, immigration, national defense, or national security official to assist the official receiving the information in the performance of that official's duties. An attorney for the government may also disclose any grand-jury matter involving, within the United States or elsewhere, a threat of attack or other grave hostile acts of a foreign power or its agent, a threat of domestic or international sabotage or terrorism, or clandestine intelligence gathering activities by an intelligence service or network of a foreign power or by its agent, to any appropriate federal, state, state subdivision, Indian tribal, or foreign government official, for the purpose of preventing or responding to such threat or activities.

(i) Any official who receives information under Rule 6(e)(3)(D) may use the information only as necessary in the conduct of that person's official

duties subject to any limitations on the unauthorized disclosure of such information. Any state, state subdivision, Indian tribal, or foreign government official who receives information under Rule 6(e)(3)(D) may use the information only in a manner consistent with any guidelines issued by the Attorney General and the Director of National Intelligence.

(ii) Within a reasonable time after disclosure is made under Rule 6(e)(3)(D), an attorney for the government must file, under seal, a notice with the court in the district where the grand jury convened stating that such information was disclosed and the departments, agencies, or entities to which the disclosure was made.

(iii) As used in Rule 6(e)(3)(D), the term ''foreign intelligence information'' means:

(a) information, whether or not it concerns a United States person, that relates to the ability of the United States to protect against—

• actual or potential attack or other grave hostile acts of a foreign power or its agent;

• sabotage or international terrorism by a foreign power or its agent; or

• clandestine intelligence activities by an intelligence service or network of a foreign power or by its agent; or

(b) information, whether or not it concerns a United States person, with respect to a foreign power or foreign territory that relates to—

• the national defense or the security of the United States; or

• the conduct of the foreign affairs of the United States.

(E) The court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter:

(i) preliminarily to or in connection with a judicial proceeding;

(ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury;

(iii) at the request of the government, when sought by a foreign court or prosecutor for use in an official criminal investigation;

(iv) at the request of the government if it shows that the matter may disclose a violation of State, Indian tribal, or foreign criminal law, as long as

A9

the disclosure is to an appropriate state, state-subdivision, Indian tribal, or foreign government official for the purpose of enforcing that law; or

(v) at the request of the government if it shows that the matter may disclose a violation of military criminal law under the Uniform Code of Military Justice, as long as the disclosure is to an appropriate military official for the purpose of enforcing that law.

(F) A petition to disclose a grand-jury matter under Rule 6(e)(3)(E)(i) must be filed in the district where the grand jury convened. Unless the hearing is ex parte—as it may be when the government is the petitioner—the petitioner must serve the petition on, and the court must afford a reasonable opportunity to appear and be heard to:

(i) an attorney for the government;

(ii) the parties to the judicial proceeding; and

(iii) any other person whom the court may designate.

(G) If the petition to disclose arises out of a judicial proceeding in another district, the petitioned court must transfer the petition to the other court unless the petitioned court can reasonably determine whether disclosure is proper. If the petitioned court decides to transfer, it must send to the transferee court the material sought to be disclosed, if feasible, and a written evaluation of the need for continued grand-jury secrecy. The transferee court must afford those persons identified in Rule 6(e)(3)(F) a reasonable opportunity to appear and be heard.

**(4) *Sealed Indictment.*** The magistrate judge to whom an indictment is returned may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial. The clerk must then seal the indictment, and no person may disclose the indictment's existence except as necessary to issue or execute a warrant or summons.

**(5) *Closed Hearing.*** Subject to any right to an open hearing in a contempt proceeding, the court must close any hearing to the extent necessary to prevent disclosure of a matter occurring before a grand jury.

**(6) *Sealed Records.*** Records, orders, and subpoenas relating to grand-jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury.

**(7)** *Contempt.* A knowing violation of Rule 6, or of any guidelines jointly issued by the Attorney General and the Director of National Intelligence under Rule 6, may be punished as a contempt of court.